IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **UNITED STATES OF AMERICA**, <br><br> v. <br><br> **WILLIAM MCFALL**, <br><br> Defendant. | Criminal No. 07-411 |

**MEMORANDUM OPINION AND ORDER**

CONTI, District Judge.

Pending before the court is a motion to suppress evidence and statements (ECF No. 83) filed by Defendant William McFall ("Defendant" or "McFall") in the above-captioned case. On November 27, 2007, a federal grand jury in the Western District of Pennsylvania returned a one-count indictment charging Defendant with possession of child pornography in violation of 18 U.S.C. § 2252(a)(4)(B). (ECF No. 1.) On September 14, 2010, the court held a competency hearing as to Defendant, and in a memorandum opinion issued on February 4, 2011 found Defendant competent to stand trial. (ECF No. 76.)

On June 8, 2011, Defendant filed a motion to suppress evidence and statements (ECF No. 83) and a motion to produce evidence under Federal Rules of Evidence 404(b) and 609 (ECF No. 84). The court held a hearing on those pretrial motions on October 17, 2011. During the hearing, the court denied as moot Defendant's motion for production of evidence (ECF No. 84.) The court also denied portions of Defendant's motion to suppress evidence. Specifically, the court denied Defendant's motion to suppress with respect to Defendant's argument that the warrant was not supported by probable cause, and denied Defendant's motion for a Franks hearing. The court heard testimony from McFall, as well as from two government witnesses:

1

Special Agent Kenneth Rochford ("Rochford") of Immigration and Customs Enforcement ("ICE"); and Detective Lynn Havelka ("Havelka") of the Allegheny County District Attorney's Office. The parties filed proposed findings of fact and conclusions of law with respect to the two grounds raised in the motion to suppress which were not ruled upon during the suppression hearing: (1) alleged violations of the <u>Miranda</u> requirements; and (2) the voluntariness of Defendant's confessions. Defendant filed his proposed findings of fact and conclusions of law on December 19, 2011 (ECF No. 99), and the government filed its proposed findings and conclusions on December 20, 2011 (ECF No. 100). Upon consideration of the parties' submissions and the evidence and testimony presented at the suppression hearing, the court makes the following findings of fact and conclusions of law:

## I. Findings of Fact

1. Federal agents and local police officers (collectively, the "agents") executed a search warrant at Defendant's residence on the morning of May 7, 2007. (Hr'g Tr. Oct. 17, 2011 ("Suppression Transcript") (ECF No. 98) at 93-94.) The team executing the warrant was comprised of five ICE agents, including Rochford, as well as Havelka and Pennsylvania State Trooper Tyler ("Tyler"). (<u>Id.</u> at 110.)

2. Defendant's aunt, Vivian Consuelo ("Consuelo"), was the owner of the residence, a trailer home. (<u>Id.</u> at 94.) Defendant lived in the residence with his aunt. (Hr'g Tr. Oct.6, 2010 ("Competency Transcript") (ECF No. 70) at 109.)

3. Consuelo was present at the residence when the agents arrived. (Suppression Transcript (ECF No. 98) at 95.)

4. Defendant was not at the residence when the search began; he was working as a janitor at the Lawrence County Courthouse. (<u>Id.</u> at 94-95.)

5. Defendant has worked as a janitor at the Lawrence County Courthouse for thirty-five years. (Id. at 175.) He has no hearing in his left ear and has lost eighty percent of his hearing in his right ear. (Id. at 176.) He graduated from high school in a special education program. (Id. at 175.) The court previously found, in connection with Defendant's competency hearing, that Defendant "has a bilateral hearing loss, and is borderline mentally retarded." United States v. McFall, No. 07-411, 2011 WL 465718, at *13 (W.D. Pa. Feb. 4, 2011). In preparation for his prior competency hearing, Defendant underwent intelligence testing by Dr. Joel D. Grover, a psychologist employed by the Western School for the Deaf, who tested him with instruments designed for deaf individuals, and found that he has an IQ of 65, identifying him as a "Deaf Individual with a Mild Intellectual Disability." Id. at *8.

6. After the agents began the search, Tyler, accompanied by a local police officer, was sent to retrieve Defendant from his place of work, advise him about the search warrant, and convince him to return home. (Suppression Transcript (ECF No. 98) at 95.) Police officers are usually not sent to retrieve suspects during the execution of search warrants, but Tyler was sent because he "knew Mr. McFall from prior interactions." (Id. at 112, 131.) Defendant, however, did not know Tyler. (Id. at 191.)

7. Defendant was cleaning state magistrate judges' offices the morning of the search and was in his truck driving between locations when he received a phone call from a state trooper. (Id. at 177-78.) The trooper told Defendant to return to the courthouse. Defendant believed he was required to return to the courthouse. (Id. at 178.)

8. When Defendant returned to the courthouse, he was met by the two armed, uniformed police officers, one of whom was Tyler. (Id. at170.) Tyler told Defendant, "I'm not here to arrest you; get your stuff, punch out and go home." (Id. at 180.) Tyler did not say

3

anything about a search warrant. (Id. at 181.)

9. Defendant was worried his aunt had been harmed, returned to his truck and drove his truck home, followed by Tyler. (Id.)

10. When Defendant arrived at his residence, he was patted down by Rochford outside the house. (Id. at 181.) Defendant testified Rochford disarmed him of a penknife, but Rochford does not recall that happening. (Id. at 181, 113.) Tyler and the other police officer who met McFall at the courthouse were also outside with Rochford and McFall during the pat down. (Id. at 114.) Several neighbors were watching from a nearby home. (Id. at 183.)

11. When Defendant entered the house, he found approximately five agents moving from room to room and searching the home. (Id. at 184.) He saw Consuelo standing in the living room, crying. (Id. at 183.) As they entered the house, Rochford, who was armed but not in uniform, presented Defendant with the search warrant, told Defendant that the agents were at the residence to execute a search warrant and question him, and told Defendant he was free to leave the residence if he did not want to be questioned. (Id. at 159.) McFall did not remember hearing Rochford tell him that he was free to leave the house. (Id. at 184.) Rochford told McFall that he should sit at the kitchen table if he wanted to talk to the agents, but to sit in the living room if he did not want to say anything; Defendant did hear Rochford give him these two options. (Id.) Defendant heard that he was not required to speak to the agents. (Id.)

12. Defendant decided to sit at the kitchen table for questioning and was willing to speak to the agents. (Id. at 194.)

13. The kitchen is immediately adjacent to the living room. (Id. at 189.)

14. The questioning in the kitchen began at approximately 11:00 a.m. and concluded between thirty and forty minutes later. (Id. at 100, 106.) Rochford, Havelka and Defendant were

all seated at the kitchen table during the interview, within a few feet of each other. (Id. at 96, 135.)

15. Defendant was not given complete Miranda warnings, either written or oral. (Id. at 130, 156.) At the beginning of the questioning Rochford told Defendant he could have an attorney present, did not have to answer any questions, was not under arrest, and could leave. (Id. at 98, 99, 143, 146-47, 158-60.) Rochford asked McFall if he understood that advice, and he said he did. (Id. at 99.) McFall only remembered hearing that he did not have to answer any questions. (Id. at 193.)

16. Rochford asked the majority of the questions, while Havelka took notes. (Id. at 146.) When Rochford and Havelka talked to Defendant, he would look them in the face. (Id. at 136.)

17. Defendant was scared during the questioning. (Id. at 187.) He was afraid of getting into trouble. (Id. at 196.) The agents were professional during the questioning, were nice to Defendant, and never became hostile with him. (Id. at 196-97.)

18. At one point, McFall asked to use the restroom during the questioning and when he used the restroom was required to leave the door open halfway while he urinated so that a male agent could keep him in sight from outside. (Id. at 188.)

19. Defendant was never handcuffed. (Id. at 194.)

20. Both Havelka and Rochford were armed, but not in uniform. (Id. at 106, 134.) Neither drew their weapon at any point during the questioning. (Id. at 106, 193-94.)

21. There was no loud or confusing noise in the kitchen during the questioning. (Id. at 146.) Although Defendant is severely hearing impaired, he was responsive and followed the line of questioning with the help of his hearing aid. (Id. at 97-98, 145-46.) Defendant's speech

5

was different but understandable. (Id. at 154.) During the interview, Rochford and Havelka noticed Defendant's hearing aid and asked him if he was having any problem hearing; Defendant stated that he was a little, but just asked them to speak loudly and if there was an issue he would turn up his hearing aid. (Id. at 97, 146.) Defendant understood most of the questions asked of him, and if he did not understand, he asked the agents to repeat themselves. (Id. at 195.) After asking for clarification, he understood most of the questions asked of him. (Id.)

22. The agents did not know that McFall was intellectually disabled when they interviewed him. (Id. at 108.)

23. Defendant made incriminating statements during the interview to the effect that he had obtained and preserved illegal child pornography on his computer and on CDs which he stored in a safe that was located in his living space. (Id. at 195-97.)

24. Defendant initially lied about the contents of his safe, but when he was informed that agents would force it open pursuant to the warrant, Defendant identified its contents. (Id. at 189, 195-96.) Rochford and another agent walked with Defendant to the safe to keep the residence secure because there was an active search in progress, and Defendant opened the safe. (Id. at 103, 126-27, 131-32.)

25. At the conclusion of the interview, Defendant was asked to read and sign the notes prepared by Havelka during the interview, and he signed the last page and initialed the other pages. (Id. at 199.) He was able to read most, but not all, of the handwritten notes. (Id. at 198.)

26. After the questioning concluded, Defendant remembered being told to return to the living room where Consuelo was waiting and where he remained until the agents left the residence. (Id. at 189.) Rochford told McFall he could leave the residence instead of waiting in

6

the living room, but McFall did not remember hearing or being told that he could leave. (Id. at 124, 189.) McFall was not arrested and remained in the residence with Consuelo after the agents left. (Id. at 199.)

II.     **Conclusions of Law**

### Miranda Warnings

27.     A defendant who has "been taken into custody or otherwise deprived of his freedom of action in any significant way" must be given the warnings prescribed in Miranda v. Arizona, 384 U.S. 436, 437 (1967).

28.     These warnings are required because custodial interrogation involves "inherently compelling pressures." Id. at 467.

29.     Because Defendant was not given his complete Miranda warnings, the court must determine whether his interrogation was custodial.

30.     Whether a suspect is in custody is an objective inquiry, J.D.B. v. North Carolina, 131 S. Ct. 2394, 2402 (2011), which is determined on a case-by-case basis, United States v. Leese, 176 F.3d 740, 743 (3d Cir. 1999).

31.     There are two discrete inquiries in determining whether an interrogation was custodial: "'first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave.'" J.D.B., 131 S. Ct. at 2397 (quoting Thompson v. Keohane, 516 U.S. 99, 112 (1995)). "Once the . . . players' lines and actions are reconstructed, the court must apply an objective test to resolve the ultimate inquiry: was there a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." Thompson, 516 U.S. at 112. Courts should consider all the circumstances surrounding the interrogation, including any circumstance

that would have affected how a reasonable person in the suspect's position would perceive his or her freedom to leave. J.D.B. v. North Carolina, 131 S. Ct. at 2402. The mindset or subjective views and opinions of either the person being questioned or the interrogating officer are irrelevant to the inquiry. Id.

32. The Court of Appeals for the Third Circuit has identified five factors which courts consider as part of a Miranda custody inquiry: "(1) whether the officers told the suspect he was under arrest or free to leave; (2) the location or physical surroundings of the interrogation; (3) the length of the interrogation; (4) whether the officers used coercive tactics such as hostile tones of voice, the display of weapons, or physical restraint of the suspect's movement; and (5) whether the suspect voluntarily submitted to questioning." United States v. Willaman, 437 F.3d 354, 359-60 (3d Cir. 2006); accord United States v. King, 604 F.3d 125, 138 (3d Cir. 2010).

33. Four of the five Willaman factors weigh in favor of a finding that McFall's questioning was noncustodial, and the remaining factor is neutral.

34. With respect to the first factor – whether the suspect was told he was under arrest or free to leave – Rochford told Defendant upon arrival that he was free to leave if he did not want to answer any questions, and also told Defendant that he was not under arrest when the questioning began. (Suppression Tr. (ECF No. 98) at 99, 158-60.) The agents also told Defendant he was free to leave the trailer home after the questioning ended. (Id. at 124, 159.) Defendant did not remember hearing or being told he was free to leave, (id. at 189), but he also testified that Tyler told him that he was not under arrest when he arrived at the courthouse before returning home. (Id. at 180.) In the context of this case, Defendant's specific disabilities appear to be subjective factors. There were no factors about his specific disabilities that would objectively appear to impede his ability to hear and understand. While he had a hearing aid, he

8

was able to hear and understand most of what was said to him and he did not appear to be mentally disabled. The court does not consider evidence of subjective matters in determining whether the interrogation was custodial due to the objective nature of the inquiry. The court must determine the custody issue in the framework of a reasonable person in the suspect's position. See J.D.B. v. North Carolina, 131 S. Ct. 2394, 2402 (2011) (citing Yarborough v. Alvarado, 541 U.S. 652, 668 (2004), for the principle that "officers are under no duty to consider contingent psychological factors when deciding when suspects should be advised of their Miranda rights." (internal quotations omitted)). The Miranda test is purposely designed to avoid the need for individualized inquiries into the capacities and needs of suspects being interrogated. Id. at 2396-97 ("By limiting analysis to objective circumstances, the test avoids burdening police with the task of anticipating each suspect's idiosyncrasies and divining how those particular traits affect that suspect's subjective state of mind."). The Supreme Court in J.D.B. recently considered the age of a defendant in a Miranda custody determination. There, the Court held that a minor suspect's age may be considered as part of the objective custody analysis "so long as [his or her] age was known to the officer at the time of police questioning, or would have been objectively apparent to a reasonable officer." Id. at 2406. The Court explicitly reemphasized the objective nature of the inquiry. Id. at 2402, 2406. The Court considered that a child's age, like blindness, can be an objective factor. In either of those circumstances, "the question becomes how a reasonable person would understand the circumstances, either from the perspective of a blind person or . . . a 13-year-old child." Id. at 2406 n.9. J.D.B. emphasized that the objective custody analysis is the standard to be employed in determining whether a person is in custody. J.D.B. did not overturn the core aspects of Miranda's prophylactic regime, which "often require[s] courts to ignore personal characteristics that may be highly relevant to a

9

particular suspect's actual susceptibility to police pressure." J.D.B. 131 S. Ct. at 2408-09 (Alito, J., dissenting). At least one court in a civil case suggested that J.D.B. is limited to cases where a child is the person being questioned. C.S. v. Couch, No. 1:10–CV–231, 2011 WL 6888368, at *16 (N.D. Ind. Dec. 28, 2011) (noting that the Miranda custody inquiry is objective, and that the holding in J.D.B. is "limited to the questioning of children by law enforcement officers"). Under that limited approach,[1] a court would determine the custody issue with respect to a hypothetical reasonable person, and arguably should not consider Defendant's psychological or hearing disabilities. Even if the court were to consider McFall's disabilities, under J.D.B. the police officers would have to have known about McFall's disabilities or those disabilities would have to have been objectively apparent to a reasonable officer. Here, the officers were not aware of McFall's mental disability while they were questioning him, and, while they saw McFall's hearing aid, they were able to communicate with him. The circumstances would not have made a reasonable officer aware of the inability of McFall to hear them or that he would be susceptible to police questioning. The first factor weighs in favor of a finding that the interrogation was noncustodial.

35. With respect to the second Willaman factor – location or physical surroundings of the interrogation – while Defendant was told to return home by two officers, was patted down in the presence of at least three officers before entering the home, and saw four or five officers

---

[1] In the dissenting opinion in J.D.B., Justice Alito noted:

> [I]n future cases the Court will be forced to choose between two unpalatable alternatives. It may choose to limit today's decision by arbitrarily distinguishing a suspect's age from other personal characteristics—such as intelligence, education, occupation, or prior experience with law enforcement—that may also correlate with the susceptibility to coercive pressures. Or, if the Court is unwilling to draw these arbitrary lines, it will be forced to effect a fundamental transformation of the Miranda custody test—from a clear, easily applied prophylactic rule into a highly fact-intensive standard resembling the voluntariness test that the Miranda Court found to be unsatisfactory.

J.D.B. v. North Carolina, 131 S. Ct. 2394, 2409 (2011) (Alito, J., dissenting).

10

searching the residence when he entered it, he drove his own truck to his residence, knew he did not have to answer questions, was questioned in his own residence, at a kitchen table, took a break to use his own restroom, and was in close proximity to his aunt. The totality of those circumstances favors a finding that the interrogation was noncustodial. While not a determinative factor itself, "courts are more likely to find that a Defendant is not in custody when he is in the comfort of his own home." United States v. Rodriguez, No. 1:09-CR-00219, 2010 WL 1485704 at *7 (M.D. Pa. Apr. 12, 2010); see Perrin, 659 F.3d at 721 (noting (1) that although the bedroom in which the interrogation in that case occurred was police dominated, "[a] reasonable person would have taken some comfort . . . in being in his own bedroom instead of an interrogation room at the police station" and (2) that "[a]ny warrant search is inherently police dominated [and] there is nothing untoward about that circumstance."); Willaman, 437 F.3d at 360 (citing United States v. Czichray, 378 F.3d 822, 826-27 (8th Cir. 2004) ("When a person is questioned on his own turf . . . the surroundings are not indicative of the type of inherently coercive setting that normally accompanies a custodial interrogation." (internal citations and quotations omitted))). The second factor weighs in favor of a finding that the interrogation was noncustodial.

36.  With respect to the third Willaman factor – the length of the interrogation – the record indicates that the questioning lasted approximately thirty to forty minutes. The questioning did not last for hours which might have lead a reasonable person to conclude that he was in custody, but it also did last more than a brief period of time, such as ten minutes, which would not lead a reasonable person to believe he was in custody. Compare, e.g., United States v. King, 604 F.3d 125, at 138 (3d Cir. 2010) (holding that an interrogation which lasted "several hours" weighed in favor of a finding of custody), with United States v. Killingsworth, 118 F.

11

App'x 649, 651-52 (3d Cir. 2004) (finding an interrogation lasting less than ten minutes not to indicate a custodial situation). Because the period of questioning was not lengthy but still was not short, the third factor does not weigh strongly in favor of a finding that the interrogation was either custodial or noncustodial, and is therefore neutral.

37. With respect to the fourth Willaman factor – whether coercive tactics were used – there is no indication that any of the agents used any coercive or physical tactics. Defendant testified that the agents were nice to him, were professional, and never became hostile with him. Defendant was not physically restrained at any point. The two interrogating agents were not in uniform, but were carrying firearms. Neither displayed or drew their weapons in Defendant's presence. None of the coercive tactics described in Willaman, such as "hostile tones of voice, the display of weapons, or physical restraint of the suspect's movement," 437 F.3d at 359-60, were present in this case. For security purposes, Defendant was patted down when he arrived at the residence, was required to stay in the living room or kitchen, had to leave the door open while he urinated so that he could be observed, and was escorted to open the safe. None of these measures – individually or collectively – rise to the level of coercion. A reasonable person, who was told he was free to leave, did not have to answer questions, and was not under arrest, would understand that the officers were maintaining security at the site of an ongoing investigation. The fourth factor weighs in favor of a finding that the interrogation was noncustodial.

38. With respect to the fifth Willaman factor – whether the suspect voluntarily submitted to questioning – it is clear based on Defendant's own testimony that he voluntarily submitted to the testimony. He understood that he was given the option not to talk to the agents and could remain with his aunt, but he chose to speak with them instead. A reasonable person would conclude under these circumstances that he was not in custody. The fifth Willaman factor

weighs in favor of a finding of noncustody as well.

39. Defendant points to Orozco v. Texas, 394 U.S. 324 (1969), United States v. Craighead, 539 F.3d 1073 (9th Cir. 2008), Sprosty v. Buchler, 79 F.3d 635 (7th Cir. 1998), United States v. Griffin, 922 F.2d 1345 (8th Cir. 1990), and United States v. Fenton, No. CRIM. 98-01J, 1998 WL 356889 (W.D. Pa. May 28, 1998), as involving factually similar situations where a court concluded that a custodial interrogation had occurred even though the questioning took place in the suspect's home. (Def.'s Proposed Findings of Fact and Conclusions of Law (ECF No. 99) ¶ 69.)

40. Because the decisions cited by Defendant are factually distinguishable from the case at bar, and because Miranda custody inquiries are determined on a case-by-case basis, Leese, 176 F.3d at 743, they are unpersuasive. Specifically, in Orozco v. Texas, the Supreme Court relied heavily on testimony of one of the investigating officers that the defendant even while in his home was under arrest and would not have been permitted to leave if he had attempted to do so. 394 U.S. at 327. Not only are the facts of that case distinguishable from the facts of this case, the progeny of Miranda reflect significant developments since Orozco was decided in 1969. The primary factual basis for the Orozco decision, the police officer's undisclosed belief that from the moment the police entered the suspect's room, he was under arrest and not free to leave, could not currently be considered by a court in a Miranda custody determination, by reason of the development of the case law. See J.D.B., 131 S. Ct. at 2402 ("'[T]he subjective views harbored by . . . the interrogating officers . . .' are irrelevant." (quoting Stansbury v. California, 511 U.S. 318, 323 (1994))).

41. United States v. Craighead is inapposite to this case. There, the court's determinations were based on the suspect being isolated with three police officers, some of

13

whom were dressed in protective gear, in an unfurnished storage room of his house, where he was intentionally segregated from individuals who could provide him with emotional support. The door was shut, and one of the officers leaned against it so as to bar exit. Craighead, 539 F.3d at 1084-89. The court noted that unlike the circumstances in that case, "[a]n interview conducted in a suspect's kitchen, living room, or bedroom might allow the suspect to take comfort in the familiar surroundings of the home and decrease the sensation of being isolated in a police-dominated atmosphere." Id. at 1088. Here, the interview occurred in McFall's kitchen, only one room away from his aunt, with whom he had the option to sit quietly, and there is no evidence that officers were positioned in a way to physically bar McFall's exit.

42. Sprosty v. Buchler is also unpersuasive. There, the United States Court of Appeals for the Seventh Circuit considered it to be a "close question" whether the suspect was in custody. Sprosty, 79 F.3d at 641. Although he was in the presence of his mother and one family friend, and his mother was permitted to telephone her own attorney, the court concluded that he was in custody because "[w]hen the police arrived at the mobile home, they surrounded Sprosty's car, blocked the driveway from his car to the street . . . escorted him inside . . . repeatedly asked Sprosty [for three hours] to tell them where the incriminating photographs were located," offered him a deal for cooperation, and assigned one police officer to stay with him, with the undisclosed but ultimately apparent purpose of preventing him from leaving. Id. at 641-42. Unlike the circumstances in Sprosty, in this case, there is no evidence that the police surrounded or blocked McFall's car, questioned him continuously for hours, discussed deals for cooperation, or implicitly communicated to him that he could not leave. To the contrary, McFall was questioned for no more than forty minutes, was explicitly told he was permitted to leave the residence and was told he did not have to answer questions.

43. United States v. Griffin, 922 F.2d 1345 (8th Cir. 1990), is likewise unpersuasive. The Court of Appeals for the Eight Circuit in Griffin concluded that the suspect was in custody because he was told to remain in view of the agents at all times, did not initiate the questioning, was not told he had the option to reject their request for an interview, and *was not informed* that (i) he was not under arrest, (ii) he could ask the agents to leave his home, or (iii) he could refuse to answer their questions. Here, although the agents kept McFall within sight, he *was* told (i) he was not under arrest, (ii) he could leave the residence, and (iii) he did not have to talk to the agents.

44. Finally, United States v. Fenton, No. CRIM. 98-01J, 1998 WL 356889 (W.D. Pa. May 28, 1998), is equally unpersuasive. In Fenton, the court emphasized that the defendant was alone in a single-room dwelling with three officers—one of whom was standing in the doorway of the only exit and several colleagues of whom could be heard outside the doorway—and was told that mental health personnel were coming to evaluate him. Id. at *6-7. The court considered the testimony of one of the police officers that he intended to confine the defendant in the room, and noted that this intention became manifest to the defendant (and relevant to the custody inquiry) by the posture and behavior of the officers. Id. Here, there is no evidence that Defendant was physically blocked from exiting either the kitchen or the residence, or any evidence that the police officers physically communicated or manifested an intention to keep McFall in custody. To the contrary, the officers explicitly told McFall he did not have to answer questions and were not positioned to prevent him from leaving.

45. United States v. Perrin, which involved a man of diminished intellectual functioning who admitted to agents in the bedroom of his own residence, while the agents were executing a search warrant, that he was in possession of child pornography, has more factual

15

similarities to this case. United States v. Perrin, 659 F.3d 718, 719 (8th Cir. 2011). The court relied on the following facts: (1) the defendant and the other persons present in his home were told they could leave and did not have to answer questions about ten minutes before the questioning began; (2) the questioning lasted only ten minutes; (3) the defendant volunteered to go to the bedroom; (4) he was not physically restrained and there was no evidence that the agents were positioned to block his exit; (5) although the room was police dominated, the questioning occurred in the comfort of the defendant's own residence; and (6) the door to the bedroom was cracked open. Id. at 721. Those facts very nearly align with the facts of this case, with two exceptions. First, McFall was told to go to his home by a state trooper, who followed him to the residence. Second, the length of questioning in this case was thirty to forty minutes, not ten minutes. Like the defendant in Perrin, McFall was told he did not have to answer questions, he was not physically restrained and he voluntarily went to his own kitchen. There is no evidence that the kitchen had a door or was closed off from the rest of the residence.

46. There are also facts in this case, not present in Perrin, which are favorable to a finding that McFall was not in custody at the time he was questioned in his home. First, in Perrin, the defendant was questioned by one officer in his bedroom, while another officer searched the same room. Id. at 720. In this case, the setting of the interrogation was more insulated from the locus of the investigatory search of the residence. Second, the defendant in Perrin was present at his home when the search team first arrived to execute the warrant. Id. At least six officers, in tactical gear, entered the house, while other officers secured the outside perimeter of the house. Id. The defendant was seated in the living room with his mother when the police came into the house, and two other residents were present. Id. The officers had all four people stay in the living room, where they were watched by two officers, at least one of

16

whom was armed. Id. In the case at bar, McFall was not present when the police arrived. Although McFall was met by two state troopers at the courthouse, was told to punch out and go home, and was followed home by police, the police exerted less force on him than the kind of force evident from the facts in Perrin. In that case, the court of appeals rejected an argument raised by the defendant that the overwhelming police presence in his home was demonstrative of custody, holding that "[a]ny warrant search is inherently police dominated [and] that there is nothing untoward about that circumstance." Id. at 721. The court rejected a secondary argument based on the defendant's "sub-average intelligence" as failing on the facts. Id. (holding that the court need not consider the question as a matter of law because the defendant did not appear to have difficulty answering questions and did not "exhibit[] any unusual intellectual deficit").

47. Upon consideration of all the circumstances surrounding the questioning of Defendant, and in further consideration of the factors outlined in United States v. Willaman, the court concludes that a reasonable person in Defendant's position would have perceived that he was free to terminate the conversation with Rochford and Havelka and to leave. Under those circumstances, Defendant was not in custody when he was being questioned.

48. Because the questioning of Defendant was not custodial, the agents were not required to give him Miranda warnings. Miranda v. Arizona, 384 U.S. 436, 437 (1967). Their failure to do so does not provide the basis for suppression of his statements. Defendant's motion to suppress on Miranda grounds is denied.

## The Voluntariness of the Confessions

49. Involuntary confessions violate the Due Process Clause of the Fifth and Fourteenth Amendments of the United States Constitution. Colorado v. Connelly, 479 U.S. 157, 165 (1986).

50. An involuntary statement made to a law enforcement officer is inadmissible into evidence. United States v. Jacobs, 431 F.3d 99, 108 (3d Cir. 2005) (citing Schneckloth v. Bustamonte, 412 U.S. 218, 225-26 (1973)).

51. To determine the voluntariness of a confession, the court must assess, under the totality of the circumstances, whether the confession was the result of an essentially free and unconstrained choice by its maker. Schneckloth, 412 U.S. at 225. If a person's will is overborne or his capacity for self-determination is critically impaired, his or her statements are involuntary. Id. at 225-26. The voluntariness determination is subjective, and the court should take into account the suspect's background and experience. Jacobs, 431 F.3d at 108.

52. "A necessary predicate to a finding of involuntariness is coercive police activity." Id. (citing Connelly, 479 U.S. at 167). "Further, there must be some causal connection between the police conduct and the confession." Id.

53. The burden is on the government to establish, by a preponderance of evidence, that the challenged statement was voluntary. Id.

54. In Connelly, the defendant approached a police officer, while in a psychotic state, and gave an unsolicited confession to a murder. The Supreme Court emphasized the importance of the mental condition of the defendant in determining voluntariness, as police have switched from more physical to more psychological forms of persuasion in interrogation techniques. Connelly, 479 U.S. at 164. The Court noted, however, that the defendant's mental condition, by itself and apart from its relation to official coercion, is not dispositive of the voluntariness inquiry. Id.

55. Where the record lacks evidence of physical or psychological coercion by police, the defendant's mental capacity is not relevant to the due process inquiry into the voluntariness

of the confession.  See United States v. Chischilly, 30 F.3d 1144, 1151 (9th Cir. 1994) (holding a confession to be voluntary, where the defendant had memory problems, brain abnormalities, and was arguably mentally retarded); Derrick v. Peterson, 924 F.3d 813, 817-19 (9th Cir. 1990) (holding confession of a mentally retarded defendant voluntary); see also Young v. Walls, 311 F.3d 846, 849-50 (7th Cir. 2002) (Easterbrook, J.) (holding that any defendant competent to stand trial, and thus to waive or exercise rights *at* trial, also is competent to waive the right to counsel or to confess voluntarily, including the mentally retarded individual who was involved in that case).

56. In Colorado v. Connelly, the Supreme Court intended to foreclose claims of involuntariness where the primary thrust of the claim was based on the mental condition of the defendant, and not the conduct of the police.  Peterson, 924 F.2d at 819.  The primary thrust of Defendant's argument is based on his mental disability, not coercive police conduct.

57. As previously discussed, the government here established that the police were not coercive in their tactics.  See supra ¶ 37.  The agents were professional, friendly and not hostile. They gave Defendant a choice to talk to them or not, and their infringements on his freedom of movement in the residence were reasonably directed at maintaining officer security and the integrity of any evidence.  They inquired regarding Defendant's hearing aid and Defendant told them he could understand them.  The interview was conducted in such a way that Defendant was, by his own testimony, capable of understanding most of the questions asked of him, even with his hearing impairment, so that the agents did not unduly take advantage of his impairment. Furthermore, the agents were unaware of McFall's intellectual disability, and did not attempt to use his reduced capacity against him.   Regardless of Defendant's intellectual functioning and hearing impairments, his statements were voluntary within the meaning of the Due Process

Clause, because a finding of coercive police conduct is required to conclude the statements were involuntary and no such finding can be made here. Defendant's motion to suppress on voluntariness grounds is denied.

**III.     Order**

AND NOW, this 19th day of January 2012, upon consideration of the parties' filings, the arguments made by counsel at the suppression hearing on October 17, 2011, the testimony of witnesses and the evidence introduced at that hearing, IT IS HEREBY ORDERED that, in accordance with the findings of fact and conclusions of law filed herewith, Defendant's motion to suppress (ECF No. 83) is DENIED.

By the court,

 /s/ Joy Flowers Conti
Joy Flowers Conti
United States District Judge
